| | |
|---|---|
| ROSALYN SMALL, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 2:13-cv-02437-JMP-dkv |
| MEMPHIS-SHELBY COUNTY AIRPORT | ) |
| AUTHORITY and M. CHAD BEASLEY, | ) |
| in his individual capacity, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER FOLLOWING NON-JURY TRIAL

Plaintiff Rosalyn Small ("Plaintiff" or "Small") brings this action against Memphis-Shelby County Airport Authority ("MSCAA" or "the Airport Authority") and M. Chad Beasley ("Beasley") pursuant to the Constitution of the United States and 42 U.S.C. § 1983, Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e-2, and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (2nd Am. Compl. ¶ 1, ECF No. 59.)

The Court held a bench trial in this case over the course of five days between August 17, 2015, and September 2, 2015. (ECF Nos. 164-166, 168, 170.) Plaintiff was represented by David Sullivan. Defendant MSCAA was represented by Todd Photopulos and Diana Comes. Defendant Beasley was represented by Clarence Halmon, and Sasha Gilmore. Plaintiff called the following witnesses: Karen Davis, Craig Elliott, Derek Dean (by deposition excerpt), Sgt. Mark Lott (by deposition excerpt),

Julie Ann Stewart (by deposition excerpt), and herself. Plaintiff also testified in rebuttal and called George Mabon. (See Ex. List, ECF No. 171; Corrected Witness List, ECF No. 172.) Defendant MSCAA called the following witnesses: Derek Dean, Mark Lott, M. Chad Beasley, Julie Stewart, Tim McCarroll, Jerry Brandon, and, in surrebuttal George Mabon. (See Ex. List, ECF No. 171; Corrected Witness List, ECF No. 172.) Defendant Beasley called no witnesses and submitted no exhibits.

For the reasons set forth below, the Court finds that (1) Plaintiff failed to prove by a preponderance of the evidence that she was subject to a hostile work environment based on sex by MSCAA; (2) Plaintiff failed to prove that she was the victim of sex discrimination by MSCAA; (3) Plaintiff failed to prove that MSCAA violated her procedural due process rights; (4) MSCAA has proven that the FFDE referral was job-related and consistent with business necessity; (5) Plaintiff failed to prove that MSCAA unlawfully retaliated against her under the ADA; and (6) Beasley is entitled to qualified immunity as to all of the claims against him.

## I. FINDINGS OF FACT

### A. Stipulated Facts

Below are the stipulated facts from the Joint Pretrial Order:

a. At the time of her termination, Plaintiff was a Sergeant.

　　b. Mr. Beasley was employed by Defendant MSCAA from May 31, 2010 to April 29, 2013, during which time he was the Chief of Police for Defendant MSCAA.

　　c. Plaintiff was issued written discipline from her supervisor, Lt. Mark Williams, on November 30, 2011.

　　d. Plaintiff was relieved of duty on May 3, 2012.

　　e. Plaintiff was issued a Notice of Decision on May 18, 2012, sustaining the charges against her, suspending her for nine days.

　　f. Plaintiff was issued a Notice of Decision sustaining the charges against her and notifying her that her employment was terminated effective July 3, 2012.

(Joint Pretrial Order at 12.)

## B. Testimony and Evidence Introduced During Trial – Plaintiff's Case

### 1. Captain Karen Davis

Plaintiff's first witness, Karen Davis, is currently a Captain at MSCAA. She testified that she had been employed by MSCAA for twenty-one years and that she was promoted to Captain in 2009. As Captain, she supervised both Sgt. Small and Lt. Williams. Capt. Davis testified that Small's job performance was "excellent" and that she had encouraged Small to seek further promotion. She further testified that many of Williams' subordinates found him difficult to talk to. She explained that she had identified "Communication Skills" as an area for development for Williams based on his "argumentative" delivery

3

style and "tend[ency] to talk over those with conflicting opinions." (See Ex. 2 at 4.)

While Davis could not recall a situation where Williams was disrespectful to a male supervisor, she testified that Williams had been disrespectful to her. Specifically, Davis testified that she had disciplined Williams after she requested that he complete the evaluations for his subordinate officers and he refused and responded in a distasteful and arrogant manner. Davis issued Williams a written reprimand for this incident, but Williams was not suspended. Additionally, Davis testified that Williams appealed her written reprimand and made untruthful accusations about her in the appeal. The official response to Williams' appeal, a letter drafted by Davis and signed by Chief Beasley, found Williams' claims to have no merit, but Williams was not subject to further discipline for making false charges.

Capt. Davis further testified that she held a meeting with Lt. Williams, Sgt. Small, Capt. Johnson, and Capt. Dean. She testified that the attenuated relationship between Small and Williams was affecting the shift to the extent that she felt she needed to hold a meeting, but not necessarily to take further steps. At this time, Davis could not separate them herself because she was not the patrol supervisor, but she suggested to Beasley and Dean that Williams and Small should be separated.

Davis testified that she was not aware of any sexual harassment of Small by Williams at the time she held the meeting.

Defendant MSCAA's cross-examination of Davis was focused on the positive aspects of Davis's evaluation of Williams and the relationship conflict between Small and Williams. Davis testified that Small had once complained to Davis that Williams was "harassing" Small because Williams had given her multiple write-ups on the same day. Davis acknowledged, however, that she never saw Williams sexually harass Small, ask for Small's phone number, or ask Small to go on a date. Davis testified that she told Small to take her complaints to Chief Beasley because Davis was not assigned to patrol. Davis also suggested that Small pick a different shift to get away from Williams.

On cross-examination by counsel for Defendant Beasley, Davis further testified that she has an obligation as an officer to follow up if someone reports sexual harassment to her. Davis never reported any allegations of sexual harassment against Beasley, never received reports of sexual harassment against Beasley, and never saw Beasley act in a sexual manner toward Small.

On re-direct, Davis testified that she had seen Beasley hug individuals at the airport and that Beasley had also hugged her. Davis had not, however, seen him hug male employees. She further testified that she found Williams to be disagreeable

with respect to both males and females.  Davis testified that Small was a great worker and that there is no reason why Small should not be reinstated.

## 2. Officer Craig Elliott

Plaintiff's second witness was Officer Craig Elliott. Elliott testified regarding Sgt. Small's appearance at the roll call on May 3, 2012.

Specifically, Elliott testified that, on May 3, 2012, he stood next to Sgt. Small during the roll call.  He testified that Small was to his left, sitting in a chair, with her hand to her head.  Elliott thought it looked like Small had a headache, and that he did not see her crying.  He further testified that he did not think Sgt. Small appeared emotionally unstable.  He prepared an inter-departmental memo on his observations on May 5, 2012.

On cross-examination by counsel for MSCAA, Officer Elliott acknowledged that he had noted Small's appearance as "agitated" in his memo.  Elliott also acknowledged that, at the CSC Hearing, he testified that Small had looked "pissed."  Elliott testified that when Beasley read off Sgt. Small's name in announcing the awards, Small did not seem to hear him and that Williams had to repeat her name before she looked up.  Elliott did not see Beasley and Small interact during the roll call.

On cross-examination by counsel for Beasley, Elliott acknowledged that he has remained in the same rank of Officer with MSCAA for over ten years.

On re-direct, Elliott explained that there was no assigned seating during roll call and that there was nothing unusual about Sgt. Small sitting in the back of the room.

### 3. Captain Derek Dean (by deposition)

Plaintiff's third witness was Derek Dean, testifying by excerpt from his February 7, 2013 deposition.  Dean was employed as a Captain by MSCAA in 2012.  Dean testified that Small was respected at MSCAA and that he had no problem with her returning to work.  Dean further testified that the tension between Williams and Small was longstanding and that Small would sometimes get teary-eyed when Williams was mentioned.  Dean also acknowledged that he never recommended that Williams be suspended, although he had seen Williams behave in the manner in which Small behaved during the May 3, 2012 meeting.

Counsel for Defendant MSCAA cross-designated an excerpt from Dean's deposition, in which Dean testified that Williams did not have an angry tone during the May 3, 2012 meeting.

### 4. Sergeant Mark Lott (by deposition)

Plaintiff's fourth witness was Mark Lott, testifying by deposition excerpt.  Lott's testimony concerned his personal knowledge of the events of May 3, 2012.  Lott testified that

during the meeting on May 3, 2012, Small giggled in response to an order from Williams. According to Lott, giggling was not appropriate in this situation. Lott further testified that, when Williams tried to explain where patrol vehicles should be parked, Small started getting angry and engaged in an argument with Williams. Lott explained that this situation was not new and that Williams and Small have always "been at each other." With respect to the May 3, 2012 roll call, Lott testified that he observed Small with her face in her hands and, after Williams handed her a ribbon, wiping her eyes. According to Lott, insubordination is a very serious offense.

### 5. Julie Stewart (by deposition and CSC hearing excerpt)

Plaintiff's fifth witness was Julie Stewart, testifying by both deposition excerpt and CSC hearing excerpt. Stewart is currently employed as the Manager of Human Resources for MSCAA and was in that role in 2012. At her deposition, Stewart testified that MSCAA did not have guidelines for referring employees to a FFDE or for determining employees' rights during a FFDE. She testified that MSCAA had no rule that prohibited Small from recording the FFDE and that no individual at MSCAA told Small that she could not record the FFDE.

At the CSC hearing, Stewart again testified that MSCAA did not have a policy on recording a FFDE interview. Stewart

explained that she expected Small to pass the FFDE and return to work.

Counsel for Defendant MSCAA cross-designated an excerpt from Stewart's CSC hearing testimony, in which Stewart explained that a FFDE referral must be job-specific.

### 6. Chief M. Chad Beasley (by deposition)

Plaintiff's sixth witness was M. Chad Beasley, testifying by excerpt from his March 19, 2015 deposition. Beasley testified that he did not know the factors for referring an officer to a FFDE. With respect to the incident involving Williams and Davis, Beasley testified that, although he found Williams to be insubordinate, Beasley did not think it was appropriate to refer Williams to a FFDE. Beasley further testified that he remembered the roll call on May 3, 2012, but that he could not recall where Small was seated. He testified that, after the roll call, Dean and Lott informed him that Small was crying during the roll call and that they believed she was emotionally unstable.

Beasley also testified regarding the consequences to Small. Beasley could not recall the conversation where the decision was made to refer Small to a FFDE. Beasley also could not recall another instance where he suspended an officer for insubordination or unbecoming conduct.

Counsel for Defendant MSCAA cross-designated excerpts from Beasley's deposition. Beasley clarified that the factors he would consider in referring an officer to a FFDE include whether the officer is exhibiting bizarre behaviors, whether the officer appears to be a threat to him or herself or a threat to others, and whether the officer is able to make sound decisions. Beasley further testified that the decision to refer Small to a FFDE was not determined before her hearing. He explained that the decision was a collaborative effort between him, Human Resources, and Greaud.

### 7. Sergeant Rosalyn Small

Plaintiff Small was the final witness presented in Plaintiff's case-in-chief. Small was employed as a Sergeant by MSCAA from November 1999 until her termination in July 2012. On direct examination, Small testified on four main points: (1) her relationship with Lt. Williams; (2) her interactions with Chief Beasley; (3) her disciplinary record in 2011 and 2012; and (4) the FFDE. Small testified that she had a bad relationship with Williams. Specifically, she explained that he was argumentative and tried to tell her that she did not know what she was doing. Small further testified that beginning around May 2010, Beasley began greeting her by hugging her. In January or February 2010, Small asked Beasley to stop hugging her. Small testified that after she made this request, Beasley tried to give her a "side

hug." After she asked that he not do this, Beasley stopped hugging her altogether.

Small explained that she had worked on the "C-shift" prior to May 2010. At that point, she was reassigned to the day shift to assist MSCAA in applying for reaccreditation by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). While Small was on temporary reassignment, Williams was assigned to the C-shift, and when she returned to the C-shift, Williams was her immediate supervisor. According to Small, in the summer of 2011, there was an incident where Williams told Small that she did not know what she was doing in front of a subordinate officer, Officer Stubbs.

Additionally, in November 2011, Williams gave Small a written reprimand for insubordination. According to Small, she had apprehended a passenger who had a gun. Small testified that the MSCAA protocol is to arrest out-of-town passengers if they have a gun. Because it was the day before Thanksgiving, however, Small asked Williams if she could just give the passenger a misdemeanor citation so that the passenger could go home for Thanksgiving, but Williams instructed her to arrest the passenger. When Small wrote up the arrest, she did not charge him with unlawful possession. Williams issued a written reprimand for insubordination because Small failed to put the charge of unlawful possession on the arrest ticket. According

to Small, a written reprimand such as the one issued to her, prevents an officer from being considered for a promotion for a year. Small tried to appeal this reprimand, but her appeal was denied by George Mabon. She then re-appealed, and her second appeal was still pending at the time of her termination in 2012.

Small further testified that, in January 2012, she sent a letter to Julie Stewart alleging that "Lt. Williams has been behaving in a hostile, harassing and intimidating way." (Ex. 7 at 1.) As a result of this letter, both Small and Williams were referred to the Employee Assistance Program ("EAP") for counseling. (See Ex. 45)

With respect to May 3, 2012, Small testified that Lt. Williams gave her two orders. First, Williams told her to tell Unit 6-5 not to patrol Wilson Air. According to Small, she had seen Williams at Wilson Air on the computer and watching TV, and she giggled in response to Williams' order. Small testified that, despite giggling, she complied with the order and wrote it down on the daily shift roster. (See Ex. 9.) Second, Williams directed Small not to park on the west side of the building. Small testified that she asked him why, because planes had not been "coming over there" since August 2011. According to Small, Williams told her to lower her voice, and Small responded that her voice was not raised. Williams then located Capt. Dean and

asked him to observe the meeting.  Toward the end of the
meeting, Williams told Small that he was going to write her up.

   After this meeting, Small went to the roll call.  Small
testified that she sat in the back and that there are no
assigned seats at the roll call.  She testified that she was a
little upset that Williams told her that he was going to write
her up, but that she was not crying at the roll call.  She
further testified that after the roll call, she went to her
assignment at the terminal for about twenty minutes, after which
someone called for her to go back to Capt. Dean's office.
Beasley then told her that they were sending her home on
administrative leave because they were concerned about her
fitness for duty.  Small testified that Beasley did not ask her
if she was crying before sending her home.

   With respect to the meeting with Lisa Alex, Ph.D., on June
20, 2012, Small testified that she wanted to record their
conversation because she had previously been written up for her
tone and demeanor, so she wanted an objective record of their
conversation.  Small further testified that Dr. Alex refused to
do the FFDE interview if it was going to be recorded, unless she
was instructed otherwise.  Small understood this to mean that if
MSCAA told Dr. Alex that Small could record the interview, then
recording it would be permissible.  Small testified that they
therefore put the FFDE on hold.  After this meeting, Small

received a letter from Beasley dated June 21, 2012, terminating her salary and scheduling a hearing for June 28, 2012. (See Ex. 20.)

On cross-examination, Small acknowledged that her November 2011 written reprimand pertained not only to the incident with the passenger, but also to an incident on November 24, 2011, where Small requested to leave early. After Williams told her she could not leave early, she told him that she was sick, and he then permitted her to leave. She further acknowledged that she did not raise the issue of sexual harassment when she appealed her write-up on December 7, 2011. (See Ex. 40.) She agreed that she also did not raise the issue of sexual harassment when she filed her harassment complaint on January 10, 2012. (See Ex. 7.) Additionally, Small disagreed that she interrupted Williams during the meeting on May 3, 2012, but acknowledged that Dean reported that she did (see Ex. 49). Small testified that she did not understand her FFDE referral to be an "order," but acknowledged that she understood it was not optional. Small further testified that she was never given an "order" to complete the FFDE, but that she was told she needed to cooperate, that she was told she needed to participate, and that she was told she needed to take the FFDE if she wanted to return to duty.

On re-direct, Small testified that she failed to complete the FFDE because Dr. Alex did not ask her the interview questions or give her the test. Small also clarified that although she understood she was given a directive to complete the FFDE, a directive is different than an order. According to Small, failing to follow an order is grounds for charges for insubordination while failing to follow a directive is not.

## C. Testimony and Evidence Introduced During Trial – The Defense Case

### 8. Captain Derek Dean

MSCAA's first witness was Derek Dean. In 2011 through 2012, Dean was employed by MSCAA as a Captain. He was promoted to Chief around September or October 2013. He has since retired from MSCAA. Dean testified that, in 2011, he reported to Chief Beasley, Lt. Williams reported to Capt. Dean, and Sgt. Small reported to Lt. Williams. He acknowledged that there was friction between Williams and Small, and he testified that he had spoken with Small about choosing a different shift on two occasions. Dean also testified regarding a meeting he had with Small and Davis on January 5, 2012. On that date, Dean met with Small because he was concerned with Small's change in attitude and change in behavior and the atmosphere between Small and Williams. According to Dean, Small and Williams' conflict was creating a problem within the shift and he was concerned with

Small's ability to follow Williams' orders. Dean testified that the problems between Williams and Small were not related to gender and that Small never complained about sexual harassment by Williams or Beasley.

With respect to the November 2011 incident, Dean testified that he reviewed Sgt. Small's appeal and found that Williams was following policy as to what charges should be on the arrest ticket and that Small did not follow Williams' instruction. Dean further testified that there is no distinction between a directive and an order.

With respect to the May 3, 2012 incident, Dean testified that Williams came to Dean's office and asked him to observe the meeting in the Supervisor's Office. When Dean went to the Supervisor's Office, he observed Small calling Williams' directive "stupid" and becoming loud and disruptive. Dean testified that she continued to interrupt Williams and ask "why" every time he attempted to explain the order. Dean further testified that he asked Small to let Williams finish but she would not do so. Dean ended the meeting and testified that he anticipated continuing the meeting in his office after the roll call. During the roll call, Dean testified that he observed Small rubbing her eyes as if she were crying and burying her face in her hands. Dean also heard another officer yell that Small was crying. According to Dean, Small appeared unable to

compose herself during the meeting.  Dean testified that after
the meeting, Dean asked Beasley to speak with him because he was
concerned about Small's range of emotions and felt that her
emotional state in combination with the fact that she had a
loaded weapon and the tense relationship between her and
Williams was "not a good mix."

On cross-examination, Dean explained that he found Small's
behavior at the May 3, 2012, meeting to be aggressive, but not
threatening.  He clarified that her behavior at the meeting
alone did not cause him to be concerned about Small's emotional
state.  Dean further testified that it looked like she was
crying at the roll call that day and that he became concerned
about Small's emotional state after this observation because it
"brought it full circle."  Dean also testified regarding
incidents involving Officers Billy Stubbs and Derek Brauer where
they were reprimanded for acting aggressively or questioning
orders.  (See Exhs. 52, 53.)

On re-direct, Dean further clarified that although Small
was not yelling when he entered the Supervisor's Office on May
3, 2012, she rose to the point of yelling over the course of the
meeting.  He testified that he told Small to "calm down" during
that meeting, but that Small did not obey his order.  Dean also
testified that he considers laughing or repeatedly asking "why"
in response to an order to be insubordination.  Dean explained

that, although he was aware of the incidents involving Officers Brauer and Stubbs, he did not see those officers exhibit a range of emotions over a short period of time as Small had, and they were not referred to a FFDE.

### 9. Sergeant Mark Lott

Defendant MSCAA's second witness was Mark Lott. Lott is currently employed by MSCAA as a Sergeant and has been in that position since January 2010. Lott's testimony focused on the events of May 3, 2012. Lott testified that he was in the meeting with Small and Williams in the Supervisor's Office that day. He explained that it was uncommon, but not unheard of, for Williams to call the sergeants in before roll call. Lott testified that when Williams started giving the directive about patrolling a certain location, Small started giggling. When Williams asked Small if there was something funny, she continued to laugh. Lott testified that he found Small's conduct to be disrespectful. Lott further testified that when Williams continued to give the directive, Small interrupted him and repeatedly asked "why." According to Lott, Small got louder and increasingly aggressive. Lott testified that when Williams left the room to get Dean, Lott told Small that she was being disrespectful and inappropriate, but Small acted as if she did not hear him.

During roll call, Lott observed Small sitting in the back of the room. Lott testified that it appeared that Small was getting emotional and starting to cry. After the roll call, Lott was approached by Williams to meet in Beasley's office. Lott testified that he told Beasley that he did not think that Small was "in her right mind" at that time based on her varying emotional states. Lott further testified that he observed Small after Beasley sent her home and that she was yelling, "Let me out of this motherfucking place."

On examination by counsel for Defendant Beasley, Lott explained that he did not make a recommendation about Small's ability to work on May 3, 2012, but that he told Beasley only that Small was not "in her right mind." Lott further testified that he never saw Beasley hug Sgt. Small, but that it was not uncommon for officers to give each other "bro-hugs."

On cross-examination, Lott acknowledged that he described Small's behavior as "arguing" rather than "yelling" when he testified at the CSC hearing. Lott also acknowledged that he used the word "crying" instead of "sobbing" in his memorandum and at the CSC hearing.

On re-direct, Lott testified that he did not think that Small was fit for duty on the evening shift of May 3, 2012.

### 10. Chief M. Chad Beasley

Defendant MSCAA's third witness was M. Chad Beasley, who was employed as Chief of Airport Police at MSCAA between May 2010 and April 2013. Beasley's testimony focused on his role in Small's disciplinary incidents and the hearings. Beasley also emphasized the importance of following direct orders in a para-military setting. He explained that there is no difference between a directive and an order.

With respect to the November 2011 reprimand, Beasley reviewed Williams' written reprimand and determined that Small had failed to adhere to a direct order. In February 2012, when Small claimed that she was harassed in relation to the incident, Beasley testified that the investigation was turned over to Human Resources. Beasley testified that he met with Mabon and gave a statement regarding the incident; Mabon upheld the written warning that Williams had given Small, and Beasley considered the matter concluded at that point. In April 2012, however, Beasley held another meeting with Small and Dean regarding the incident. Beasley testified that Small was heated and "blowing off steam" during this meeting, but that he did not issue a written reprimand for her conduct in this meeting.

With respect to the events of May 3, 2012, Beasley testified that he does not recall speaking with Small or seeing her in the roll call. He further explained that the command

staff, including sergeants, normally stands in the front of the
room. Beasley testified that immediately after the roll call,
Dean came to Beasley's office to express concern over a meeting
that took place prior to the roll call. As communicated to
Beasley, during that meeting, Williams was trying to convey a
simple order while Small was laughing, talking over him, getting
upset, and being insubordinate. Dean expressed to Beasley that
Small was exhibiting a range of emotions. Beasley also spoke
with Williams and Lott because they had also been in that
meeting. Beasley testified that Williams and Lott were also
very concerned and that nothing they said made him doubt their
truthfulness. Beasley explained that Small had previously been
referred to EAP for anger management, and that based on her
emotional state, he had a duty to respond to protect Small and
the traveling public.

Beasley also testified that he participated in the internal
hearing on May 16, 2012. The panel in this hearing was composed
of Beasley, Julie Stewart, Dean, and then-Sgt. Tim McCarroll.
Beasley explained that Small had the opportunity to present her
point of view at the hearing. According to Beasley, there was
no determination of the outcome prior to the hearing; he did not
do anything to affect the votes; and the panel voted to sustain
the charges after a deliberation process. Beasley further
testified that, after the charges were sustained, he made the

disciplinary decision in consultation with Human Resources and Vice President of Operations John Greaud.  They decided to send Small for a FFDE because they wanted to make sure she was emotionally stable and could return to fulfill her duties.

Beasley testified that he was informed by Stewart that Small did not complete the FFDE despite multiple orders to do so.  As a result, there was a second panel on June 28, 2012. This panel was composed of Beasley, Stewart, Darlene Nelson, and Sgt. Jerry Brandon.  Beasley testified that there was no meeting or decision regarding the outcome prior to the hearing and that he did not do anything to influence the panel's vote.  The panel unanimously voted to sustain the charges, and the group of Beasley, Stewart, Mabon, and Greaud decided the level of discipline to be imposed.  Beasley explained that they ultimately decided to terminate her based on her failure to complete the FFDE and her insubordination.

With respect to Small's allegation that Beasley hugged her, Beasley testified that this allegation is "totally false."  He further testified that he never saw Williams harass Small, that he never saw Williams treat Small differently from anyone else, and that Small never complained that Williams was harassing her. On direct examination by his own counsel, Beasley explained that there was no particular reason why he did not hug Small, but maintained that he did not hug her.  He further clarified that

he never made sexual or derogatory remarks to or around Small.
Beasley testified that if Small had successfully completed the
FFDE, she would have been able to return to work.

On cross-examination, Beasley testified about the incident
involving Williams and Davis.  Beasley understood this incident
to involve incomplete performance reviews.  After Davis issued
Williams a written reprimand, Williams came to Beasley's office
and gave him a letter that accused Davis of abuse of authority,
unethical behavior, and unprofessional conduct.  Beasley found
that these statements had no merit and sent Williams a letter to
that effect on June 28, 2011.  With respect to the May 3, 2012,
incident, Beasley testified that his concern with Small was her
emotional instability, pattern of insubordination, and recent
referral to EAP for anger management.  He testified that he made
the decision to suspend Small in consultation with Stewart,
Mabon, and Greaud.

Additionally, Beasley acknowledged that while there was no
policy that prohibited Small from sitting in the back during
roll call, there was an expectation that the command staff stood
in the front.  Beasley explained that he did not personally see
Small crying at the roll call, and that he relied on the other
officers who told him that Small was crying or appeared to be
crying.  Beasley reiterated that it was not just one variable
that caused him to refer Small to a FFDE, but the fact that

Small exhibited a range of emotions and that, based on the information he received, he was not sure she could make sound decisions and judgments. Beasley further testified that Small violated a direct order by not complying with the FFDE in its entirety and that she exhibited unbecoming conduct, bringing the department in disrepute, by failing to follow direct, basic orders.

On re-direct, Beasley compared the incident involving Williams and Davis to the incident where Small had an outburst in a meeting with Dean and Beasley. According to Beasley, Williams was being blatantly insubordinate to Davis. On the other hand, Small raised her voice and used profanity, but she was not disciplined. Beasley also testified that he considers laughing at a supervisor's order and aggressively asking "why" to be insubordinate.

### 11. Julie Stewart

Defendant MSCAA's fourth witness was Julie Stewart. Julie Stewart has been employed by MSCAA as the Human Resources Manager since 2008. Stewart testified regarding her involvement with Small's harassment complaint and the internal panels and disciplinary decisions. Stewart testified that after Small filed a complaint against Williams, Stewart and her supervisor, George Mabon, investigated the complaint. As part of the investigation, Stewart met with Small and gave Small the

opportunity to discuss each incident. Stewart did not find merit as to Small's complaint of harassment by Williams and thought that Williams' orders seemed logical.

Stewart testified that Small did not raise a complaint about her gender at that time and that Small told her that she did not feel sexually harassed by Williams. Stewart further testified that Small never filed a complaint that Williams or Beasley were sexually harassing her or even that Beasley hugged her. Stewart testified that, based on her meeting with Williams and Small, it was apparent that the two were having trouble communicating, and she believed that Small needed professional counseling. Stewart further testified that she discussed Small's anger toward Williams and anger about being written up. Stewart met with Small again along with Beasley and Mabon in Mabon's office. Stewart testified that, after this meeting, they decided to refer Small and Williams to the Employee Assistance Program ("EAP") to deal with anger issues.

Stewart found out about the May 3, 2012, incident when she received a call from Beasley. Stewart testified that Beasley conveyed the events of that day and informed Stewart that he had relieved Small from duty. Stewart explained that she administratively handled the hearing processes and served on the panel for both hearings. Stewart corroborated earlier testimony about the hearing and disciplinary processes. Stewart further

testified that the purpose of discipline is to change a behavior; because they had already referred Small to EAP, her continued inappropriate behavior required something more strict. Stewart testified that, with respect to the May 16, 2012, and June 28, 2012, panels, neither Small's gender nor her ADA complaint had anything to do with the decisions to sustain the charges against her or to take disciplinary action.

On examination by counsel for Defendant Beasley, Stewart also testified that Dr. Alex had sent a package to MSCAA that included the letter Small had provided to Dr. Alex (Ex. 17) as well as a letter to George Mabon from Dr. Alex (Ex. 58). Stewart believed that the package arrived on June 22, 2012. She further testified that the panel on June 28, 2012, considered the information in the package in the decision-making process.

On cross-examination, Stewart acknowledged that there is no airport policy that lists the rights an employee would have in a FFDE. She also agreed that she did not make an effort to overcome the impasse between Dr. Alex and Sgt. Small. She testified that, to her knowledge, Dr. Alex did not ask MSCAA about the recording. Stewart further testified that MSCAA would have left the decision in Dr. Alex's hands as the clinical psychologist. According to Stewart, the May 3, 2012, incident and the fact that they had already referred her to EAP for anger raised concerns about whether Small could safely carry a gun and

be on the front line of the airport.  Stewart testified that
they needed a professional opinion to let them know that Small
could go back to work.  Stewart testified that MSCAA has given
out suspensions longer than nine days to male employees.

On re-direct, Stewart testified that Small never asked
MSCAA if she could record the interview with Dr. Alex.  Stewart
further testified that in the letter from Small's counsel to
MSCAA's General Counsel, Kuhn, dated June 20, 2012, Small did
not request a new tape-recorded FFDE.  Stewart also explained
that Mabon talked to Dr. Alex at some point and that this
conversation was not relied on by the panel, but was relied on
in the discussion to discipline Small.

### 12.  Lt. Tim McCarroll

Defendant MSCAA's fifth witness was Tim McCarroll.  Lt.
McCarroll was hired by the MSCAA Police Department in 1997 and
was a Sergeant in the 2011 to 2012 time frame.  McCarroll
testified that he sat on an internal hearing panel regarding
Small's conduct on May 3, 2012.  As the lowest ranking member of
the panel, then-Sgt. McCarroll voted first and voted to sustain
the charges against Small.  He testified that he had evaluated
the testimony given at the hearing and his firsthand
recollection of the events.  McCarroll was in the hallway during
Small's meeting in Williams' office and heard her repeatedly
interrupt Williams and say "why" as she got progressively

louder.  According to McCarroll, his personal observations contradicted Small's testimony at the internal hearing, in which Small denied yelling or acting in an unprofessional manner.

On cross-examination, McCarroll explained that he did not make a memo of his observations because "I did not want anything to do with it – I did not want to be drawn into this." McCarroll acknowledged that he did not tell anyone before the hearing that he had observed the incident, but that he told the panel members during the deliberation.  McCarroll further testified that he did not know what Small and Williams were discussing inside the office and did not know about the two orders that Williams gave to Small.

On re-direct, McCarroll agreed that a lieutenant would have the authority to give the orders that Williams gave to Small if he thought it was relevant and for the good of the shift.

### 13.  Chief Jerry Brandon

Defendant MSCAA's sixth witness was Jerry Brandon.  Brandon is currently the Chief of the MSCAA Police Department and was a Sergeant at the time of Small's hearing in June 2012.  Brandon testified that he sat on the internal panel on June 28, 2012, regarding the charges against Small for failing to complete the FFDE.  Brandon further testified that he had not made up his mind before the hearing and that Small had an opportunity to speak and present her point of view.  He believes that Small was

treated fairly.  As the lowest ranking member of the panel,
Brandon voted first and voted that the charges were founded.
Brandon testified that the vote was unanimous and that then-
Chief Beasley did not try to influence his vote.

Brandon further testified that he never saw Williams or
Beasley hug Sgt. Small, say anything inappropriate to Small,
touch Small inappropriately, tell inappropriate jokes to or
around Small, or say derogatory things to Small because of her
gender.  According to Brandon, however, Williams is a bully who
antagonizes people and "pushes their buttons."

On cross-examination, Brandon testified that Williams has
not been an issue since Brandon became Chief.  Brandon's
understanding of the issue relating to Small's conduct was that
she had been told to go to a FFDE, but that she did not do the
FFDE despite going to the doctor's office because Small was told
she could not record the session.  According to Brandon, Small's
asking to record the session did not reflect poorly on her as a
police officer; he sustained the charge of unbecoming conduct on
the basis that she failed to submit to a fitness-for-duty
examination as ordered.

On re-direct, Brandon clarified that there was no question
that Small was ordered to complete the FFDE and no question that
she failed to do so because she insisted on its being recorded.

**D. Testimony and Evidence Introduced During Trial –
Plaintiff's Rebuttal Case**

### 14. George Mabon

On rebuttal, Plaintiff called George Mabon, the MSCAA's
Vice President of Human Resources.  Mabon testified that MSCAA
does not have an opinion on Small's recording the FFDE because
it was in the purview of Dr. Alex as the clinical psycholgist.
Mabon further testified that, although Small's actions were not
terminable offenses from the beginning, after the FFDE "ordeal,"
he would have recommended terminating Small.

On cross-examination by counsel for Defendant MSCAA, Mabon
explained that Small's termination was cumulative, based on her
actions and behavior throughout the whole process.  He agreed
that her initial behavior was forgivable, but that it got to a
point where there was insubordination and inappropriate conduct.
He explained that Small was advised that no further delays would
be acceptable and that she needed to complete the FFDE.  Based
on the psychologist's report, Mabon's understanding was that it
was Small's decision not to go forward with the FFDE.  Although
Mabon was not on the June 28, 2012, panel, he was involved in
the decision to terminate Small based on her failure to complete
the FFDE.

On re-direct, Mabon testified that the decision to send
Small to a FFDE was a collaborative decision.  According to

Mabon, Small insisted on having the FFDE session recorded, but
Dr. Alex refused to proceed with the examination under that
condition.  Mr. Mabon testified that he listened to the audio
recording of Small and Dr. Alex's conversation, but that it does
not change the Airport Authority's opinion that Small was not
acting in good faith at the FFDE.  While Mabon testified that
Small was not disrespectful, he believed it was unbecoming for
her to request the audio recording.

### 15. Sergeant Rosalyn Small

Plaintiff called herself as her second and final witness in
rebuttal.  On rebuttal, Small testified that she had never been
given a written reprimand or been suspended before the November
2011 incident.  Small further testified that during her meeting
with Dean and Beasley in April 2012, she did not use profanity
or raise her voice.  According to Small, during the May 3, 2012,
meeting, she also did not yell or talk over Williams.  She
further testified that she did not cry or give the appearance of
crying during the roll call on May 3, 2012, and that she was
able to perform the essential job functions of Sergeant that
day.  Additionally, Small testified that she was a member of the
Crisis Intervention Team, and that she had been trained to
identify behaviors that indicate emotional distress or mental
health issues.  Small testified that giggling, laughing, talking

over someone, and arguing with a supervisor are not signs of emotional distress.

On cross-examination, Small acknowledged that she was not employed in Human Resources and did not know the Human Resources policies.

### E. Testimony and Evidence Introduced During Trial – Defendant MSCAA's Surrebuttal Case

#### 16. George Mabon

Defendant MSCAA called George Mabon for sur-rebuttal. On direct examination, he testified regarding the Human Resources and Police Department policies at MSCAA. He explained that the Office of Human Resources has a policy regarding Loudermill hearings, see infra pp. 42-43, and that his Office is responsible for conducting these hearings, not the Police Department. This policy speaks for itself. (Exhs. 65-66.)

On cross-examination, Mabon agreed that the Airport Authority policy manual does not include a policy regarding the composition of Loudermill hearing panels, but explained that there is a practice of establishing these panels in a certain way. Mabon further testified that, when the Police Department and Airport Authority policies conflict, the Airport Authority policies are the overriding authority for MSCAA.

On re-direct, Mabon further testified that not every procedure that the Airport Authority follows is reduced to

writing. This includes the composition of <u>Loudermill</u> hearing panels as well as a similar process for hiring. He again testified that the internal affairs division of the Police Department does not handle due process hearings.

## Findings of Fact

The Court has carefully considered the evidence presented at trial and finds that the following facts have been established by a preponderance of the evidence: (1) Beasley hugged Small over the course of several months, but ceased hugging her when she asked him to stop; (2) Small was not subject to sexual harassment by Williams during the time period at issue; (3) Small was not treated differently because of her gender by any accused individual at MSCAA; (4) based on the reports of Dean, Williams, and Lott, Beasley believed that Small was emotionally unstable and a potential threat to those around her; (5) MSCAA followed internal policies in providing Small hearings regarding the charges of insubordination and unbecoming conduct; (6) the outcome of these hearings was not predetermined and Small had an opportunity to present her story; (7) Small's gender did not play a role in the outcome of the hearings; (8) the May 16, 2012, panel sustained the charges of insubordination and unbecoming conduct because it found that Small, over a short period of time, laughed at an order, repeatedly questioned an order, became aggressive in response to an order, and cried

33

after receiving a reprimand; (9) following the May 16, 2012, hearing, MSCAA determined that the appropriate discipline was a nine-day suspension without pay and also determined that a FFDE was necessary to ensure that Small was psychologically fit to return to work; (10) this decision was based on Small's previous referral to EAP, her recent record of insubordination, and her erratic emotional state on May 3, 2012; (11) Small was on paid leave from May 31, 2012, through June 21, 2012; (12) Small's leave was converted from paid to unpaid on June 21, 2012, based on her failure to complete the FFDE; (13) the decision to change Small's leave status was a collaborative decision by Beasley, Human Resources, and Greaud; (14) the June 28, 2012, panel sustained the charges of insubordination and unbecoming conduct because it found that Small failed to comply with a direct order to complete the FFDE without additional delay; and (15) following the June 28, 2012, hearing, MSCAA, be means of a panel composed of Beasley, Stewart, Mabon, and Greaud, made the decision to terminate Small based on the pattern of insubordination as determined by the prior panels and based on the belief that Small was unwilling to complete the FFDE.

## II. CONCLUSIONS OF LAW

Small brings the following claims against MSCAA: (1) hostile work environment claims under Title VII and 42 U.S.C. § 1983; (2) sex discrimination claims under Title VII and 42

U.S.C. § 1983; (3) procedural due process claims under 42 U.S.C. § 1983; (4) illegal referral to a medical examination under the ADA; and (5) retaliatory discharge under the ADA.  Small also brings claims against Beasley under 42 U.S.C. § 1983 on the following bases: (1) hostile work environment, in violation of the Equal Protection Clause; (2) employment discrimination, in violation of the Equal Protection Clause; and (3) violations of the Due Process Clause of the Fourteenth Amendment.  The Court first addresses each of Small's claims against MSCAA and then addresses Small's claims against Beasley.

### A.    Hostile Work Environment

To prevail on a hostile work environment claim under Title VII and the Equal Protection Clause, a plaintiff must establish "that (1) she was a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based on her sex; and (4) the harassment created a hostile work environment."  Williams v. Gen. Motors Corp., 187 F.3d 553, 560 (6th Cir. 1999) (describing the elements of a hostile work environment claim under Title VII); see also Sharpe v. Cureton, 319 F.3d 259, 267–68 (6th Cir. 2003) (indicating that hostile work environment claims under § 1983 share the same requirements as such claims under Title VII).  A plaintiff must show that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment."  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  A hostile work environment claim includes both subjective and objective elements: a plaintiff must "establish that her environment was objectively hostile, and also that she subjectively perceived the environment to be hostile." <u>Williams</u>, 187 F.3d at 564.

Small was not the subject of a hostile work environment. As stated above, the Court finds that Small was not subject to harassment based on sex by Williams.  Additionally, the Court finds that Small was subject to hugs by Defendant Beasley, and that Beasley stopped hugging Small after she asked him to stop. While this conduct may have been subjectively hostile to Small,[1] it does not rise to the objective level of severe or pervasive harassment.  Because Small fails to prove that her environment was objectively hostile, she cannot establish that MSCAA created a hostile work environment based on sex.

---

[1] It is not clear, in fact, that this conduct was even subjectively hostile to Small.  Small presented no evidence that she complained about, or made a fleeting mention of, Beasley's conduct before this litigation.  Even her letter to Dr. Alex, which references an unnamed supervisor "who instigated the disciplinary action" and "has previously made unwelcome sexual advancements," appears to refer to Lt. Williams, not Chief Beasley.  (Ex. 17.)  In this letter, Small states that she had previously filed complaints against "this supervisor" and that one such complaint is still pending. (<u>Id.</u>)  While Small's previous complaints against Williams did not relate to <u>sexual</u> harassment, her statements in the letter to Dr. Alex are most logically construed as alluding to Lt. Williams.  Because the Court finds Beasley's conduct not to be objectively hostile, however, it need not reach the question of whether Beasley's conduct was subjectively hostile.

**B.   Sex Discrimination**

To establish a prima facie case of employment discrimination under Title VII and the Equal Protection Clause, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated employees.  White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008) (describing the requirements of establishing a prima facie case under Title VII); Lautermilch v. Findlay City Sch., 314 F.3d 271, 275 (6th Cir. 2003) ("[T]o prove a violation of the equal protection clause under § 1983, a plaintiff must prove the same elements as are required to establish a disparate treatment claim under Title VII, i.e., under the McDonnell Douglas/Burdine framework.") (internal quotation marks and alterations omitted).

"Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action."  White, 533 F.3d at 391.  "Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true

reason, but merely a pretext for discrimination." Id. at 391-
92.

### 1. Prima Facie Case

Small claims that she was discriminated against based on
sex in relation to her termination, as well as other
disciplinary treatment. Small has established a prima facie
case of sex discrimination against MSCAA as to her termination
by showing that (1) she is a woman; (2) she was qualified for
her job, as evidenced by performance evaluations; (3) she
suffered the adverse employment action of termination; and (4)
she was replaced by a person outside her protected class, a male
named Barry Wilburn.

Small has not proven, however, that she was treated
differently than similarly situated male employees with respect
to any other disciplinary action, and accordingly, she has not
established a prima facie case of sex discrimination as to any
other employment action. Plaintiff presented evidence at trial
relating to disciplinary actions taken against Officer Stubbs
(Ex. 52) and Officer Brauer (Ex. 53). Both of these
comparators, however, were ranked "Officer," whereas Plaintiff
was ranked "Sergeant." A Sergeant has different
responsibilities and greater command than an Officer, and
accordingly, cannot be considered to be "similarly situated."
Moreover, Plaintiff did not demonstrate that either of these

officers had engaged in a pattern of insubordination or exhibited a range of emotions over a short period of time. Plaintiff also did not demonstrate that a superior officer recommended suspension or a FFDE[2] in either of these incidents. Accordingly, MSCAA, through its agents and employees, did not treat these officers more favorably under circumstances that were sufficiently similar.

Lt. Williams also cannot be considered a "similarly situated" employee who was treated differently from Small. The evidence presented at trial shows that Williams received a written reprimand for insubordination and unbecoming conduct from Capt. Davis on June 7, 2011, based on Williams' refusal to comply with an order and disrespectful comments. (See Ex. 3 at 1-2,; Ex. 37 at 4.) Lt. Williams appealed this reprimand, and Beasley upheld the written reprimand. (See Ex. 3 at 3-6.) This situation nearly parallels that of Small in November 2011. In

---

[2] The Court notes that a FFDE does not necessarily constitute an adverse employment action under Title VII and § 1983. Beasley's letter to Small, dated May 18, 2012, provides that Small was placed on a nine-day suspension as discipline for the sustained charges, and that she also was required to complete a FFDE before she would be allowed to return to duty. (Ex. 12.) An adverse employment action is a "materially adverse change in the terms and conditions" of a plaintiff's employment. White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795 (6th Cir. 2004) (en banc); see also Smith v. City of Salem, 378 F.3d 566, 575 (6th Cir. 2004). A "mere inconvenience" or a "'bruised ego' is not enough to constitute an adverse employment action." White, 364 F.3d at 797 (quoting Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996)). "Examples of adverse employment actions include firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation." Smith, 378 F.3d at 575-76. It is not clear that the referral to a FFDE rises to the requisite level. The Court need not reach this question, however, because Plaintiff failed to establish the fourth prong of the prima facie case.

November 2011, Small was issued a written reprimand for insubordination, unsatisfactory performance, and neglect of duty based on her failure to comply with an order given by Williams. (See Ex. 39.)  Small then appealed the written reprimand to the chain of command.  (Exhs. 40, 42, 47.)  Capt. Dean upheld the written reprimand (Ex. 41), and Chief Beasley did the same (Ex. 43).[3]  Thus, Small and Williams both received a written reprimand for failing to follow an order, both appealed the reprimand, and in both instances, the reprimand was upheld.  In Beasley's letters to both Small and Williams following their respective appeals, he determined that the claims made in their appeal could not be "substantiated" or "valid[ated]."  (Ex. 43 at; Ex 3 at 5.)  In neither instance was a referral to a FFDE discussed or recommended.

At this point, however, the parallels end.  Plaintiff presented no evidence demonstrating that Williams was subject to disciplinary action following his written reprimand in June 2011.  Small, on the other hand, received reprimands for violations of punctuality and attendance on two occasions (see Ex. 37 at 3) and was ultimately again charged with insubordination and unbecoming conduct twice in May and June 2012.  Because of the significant differences in their

_____

[3] After receiving Beasley's letter upholding the reprimand, Small also appealed to Greaud.  (See Ex. 8.)  This appeal was still pending at the time of Small's termination.  (Id.)

disciplinary records, Small could not be considered to be similarly situated to Williams. Accordingly, MSCAA, through its agents and employees, did not treat Williams more favorably than Small under circumstances that were sufficiently similar.

### 2. Non-Discriminatory Reason and Pretext

Because Small has established a prima facie case that MSCAA terminated her based on her gender as to her termination, the burden shifts to MSCAA to articulate a legitimate, non-discriminatory reason for Small's termination. MSCAA has offered evidence to show that Small was, in fact, terminated because Small repeatedly failed to comply with direct orders and exhibited unbecoming conduct. First, Small failed to comply with Williams' November 2011 order regarding the arrest of a passenger. Second, Small acted in a disrespectful manner during a meeting with Beasley and Dean on April 4, 2012. Third, Small laughed in response to an order by Lt. Williams on May 3, 2012. Fourth, Small aggressively questioned an order by Williams on May 3, 2012. Fifth, Small failed to complete the FFDE over the course of forty-one (41) days. Between the notice of her FFDE referral on May 18, 2012, and the decision to sustain the associated charges on June 28, 2012, Small was repeatedly warned that she would not be permitted to return to work without passing the FFDE and that she would be subject to further disciplinary action if she delayed the FFDE.

Thus, the burden shifts back to Small to prove that these proffered reasons were mere pretext for sex discrimination. Small has not met this burden. The evidence presented at trial reflects that MSCAA terminated Small because it believed Small engaged in a pattern of insubordination and unbecoming conduct, not based on Small's gender.

### C. Procedural Due Process

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). "[P]ublic employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process." Gilbert v. Homar, 520 U.S. 924, 928-29 (1997). To determine what process is due, courts utilize the Mathews v. Eldridge balancing test and look at three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value . . . of additional or substitute procedural safeguards; and finally, the Government's interest." 424 U.S. 319, 335 (1976).

To comport with the Mathews balancing test, a "tenured public employee is entitled to oral or written notice of the

charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to termination.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).  Such a pretermination hearing need not be in front of an unbiased decisionmaker to comport with constitutional requirements.  Duchesne v. Williams, 849 F.2d 1004, 1006 (6th Cir. 1988).  The pretermination hearing must, however, give a "meaningful opportunity to invoke the discretion of the decisionmaker."  Loudermill, 470 U.S. 532, 543. Therefore, the hearing must not be such a "sham" that the outcome of the hearing was predetermined.  Ross v. City of Memphis, 394 F. Supp. 2d 1024, 1038 (W.D. Tenn. 2005).

### 1. Conversion of Small's Leave to Unpaid

For a tenured public employee, a suspension without pay implicates the same procedural protections as termination.  See Loudermill, 470 U.S. at 544-45 (noting that in "situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay" (emphasis added) (footnote omitted)).  There is no absolute rule, however, that a public employee is entitled to a hearing before termination of his or her salary; a post-deprivation hearing may be sufficient taking into account "the length" and "finality of the deprivation."  Gilbert, 520 U.S. at 930-32

(quoting Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982)).

MSCAA did not violate Small's right to procedural due process by converting her leave status from paid to unpaid. Small received notice of the charges against her in a letter dated May 10, 2012. (Ex. 11.) After a hearing on these charges, Small received a nine-day suspension without pay to be served May 20, 2012, through May 30, 2012. (Ex. 12.) Small additionally was required to complete a psychological evaluation to determine whether she was fit for duty. (Id.) After completing her nine-day suspension, Small was placed on administrative leave with pay pending the completion of the FFDE. (See Ex. 15 at 1.) On at least six occasions, Small was warned that her failure to comply with the fitness-for-duty examination process would result her being placed on administrative leave without pay status and could result in further discipline. (See Letters from Brian Kuhn, General Counsel, MSCAA, to David Sullivan, Counsel for Plaintiff, Ex. 15 at 1-2 (May 31, 2012), 5-6 (June 1, 2012), 8-9 (June 4, 2012), 11-12 (June 5, 2012), 18-19 (June 12, 2012), 21 (June 12, 2012).) Consequently, Small had adequate notice that she could be placed on unpaid leave if she failed to complete the FFDE.

Moreover, while Small did not receive a hearing prior to the change in her leave status on June 21, 2012, she received a

44

prompt post-deprivation hearing.  Small was subject to only seven days of unpaid leave before she had the opportunity to appear before the internal hearing panel on June 28, 2012. Additionally, this change in leave status from paid to unpaid was merely a temporary measure to penalize Small for her failure to complete the FFDE in a timely fashion, unlike her ultimate termination, which was a more permanent action.  Had the panel determined that the charges against Small were unfounded, Small would have been subject to a relatively insubstantial loss of income.  See Gilbert, 520 U.S. at 932.

The Court further notes that the government has a significant interest in preserving public confidence in the airport police force and ensuring the safety of the traveling public.  This interest is sufficiently important to justify a brief period of unpaid leave prior to affording Small a hearing. See id. at 932-33 ("[The State's] interest in preserving public confidence in its police force is at least as significant as the State's interest in preserving the integrity of the sport of horse racing . . . ."").  Accordingly, the Court concludes that MSCAA did not violate Small's due process rights when it converted her leave status from paid to unpaid after repeatedly informing her of this possibility and holding a prompt post-deprivation hearing.

## 2. Termination of Employment

MSCAA did not violate Small's right to procedural due process by terminating her employment. Small received notice of the charges against her in a letter dated June 21, 2012. (Ex. 20.) On June 28, 2012, MSCAA held a hearing and provided Small the opportunity to refute these charges. (See Ex. 64.) The evidence presented at trial demonstrates that this hearing was not a sham and that the outcome was not predetermined. Small had no constitutional right to a hearing before an unbiased decisionmaker, only a right to a hearing that provided a "meaningful opportunity to invoke the discretion of the decisionmaker." See Loudermill, 470 U.S. at 543. The panel that decided to sustain the charges against Small on June 28, 2012, was composed of Beasley, Stewart, Nelson, and Brandon. Small presented her side of the story and had the opportunity to ask questions. (See Ex. 64.) The panel considered Small's statement, as well as correspondence from Dr. Alex to Mabon and correspondence between Kuhn and Sullivan regarding the FFDE. Beasley, Stewart, and Brandon testified that they had not made up their minds about the charges before the hearing, that they deliberated after the hearing, and that the panel voted in order of most junior to most senior to avoid undue influence. Under Loudermill, the "pretermination process need only include oral or written notice of the charges, an explanation of the

employer's evidence, and an opportunity for the employee to tell his [or her] side of the story." Gilbert, 520 U.S. at 929 (citing Loudermill, 470 U.S. at 546). The evidence presented demonstrates that MSCAA satisfied the Loudermill requirements, and accordingly, Small has failed to demonstrate that the MSCAA violated her due process rights in terminating her employment.

**D.    Referral to a Medical Examination**

The ADA prohibits a covered entity from requiring an employee to submit to a medical examination "unless such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A). "'[P]sychological tests that are designed to identify a mental disorder or impairment' are 'medical examinations'" within the meaning of the ADA.  Kroll v. White Lake Ambulance Auth. ("Kroll I"), 691 F.3d 809, 816 (6th Cir. 2012).  A FFDE is by definition designed to identify a mental disorder or impairment. Accordingly, the Court finds that the FFDE is a "medical examination" within the meaning of the ADA.

Whether an examination is "job-related and consistent with business necessity" is an affirmative defense.  See Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 78 (2002).

> The employer bears the burden of proving that a
> medical examination is job-related and consistent with
> business necessity by demonstrating that: (1) the
> employee requests an accommodation; (2) the employee's
> ability to perform the essential functions of the job

is impaired; or (3) the employee poses a direct threat
to himself or others.

Kroll v. White Lake Ambulance Auth. ("Kroll II"), 763 F.3d 619,
623 (6th Cir. 2014) (internal quotation marks omitted).  With
respect to whether an employee poses a direct threat, the Sixth
Circuit has found that a lower threshold is sufficient for an
examination in workplaces in which employees "respond to
stressful situations and shoulder responsibility for public
safety": "an employer may be justified in requesting a
psychological exam on slighter evidence than in other types of
workplaces because employees are in positions where they can do
tremendous harm if they act irrationally, and thus they pose a
greater threat to themselves and others."  Id. at 626 (internal
quotation marks omitted).

Under the standard applicable to public safety employees,
MSCAA has demonstrated that the FFDE referral was "job-related
and consistent with business necessity" because Small's erratic
emotional state made her unable to carry out her duties and she
posed a direct threat to herself and others.  As an armed police
officer in a paramilitary organization, Small's emotional
stability was essential to her ability to perform her essential
job functions, such as wielding a firearm and managing
potentially dangerous and stressful situations, and to ensure
the safety of Small, other officers, and the traveling public.

On May 3, 2012, Beasley received reports from three supervisory officers that they were concerned about Small's emotional state. As a result, Beasley believed there was reason for concern and temporarily placed Small on leave pending her fit-for-duty status. (See Ex. 55.) After the charges against Small were sustained, MSCAA officially referred Small to a FFDE. (Ex. 12.) Based on Small's previous referral to EAP and her erratic emotional state on May 3, 2012, MSCAA determined that a FFDE was a necessary to ensure that Small was, in fact, emotionally and mentally fit for duty and not a direct threat to herself or others.

Accordingly, the Court concludes that MSCAA has demonstrated that the referral to FFDE was "job-related and consistent with business necessity." Thus, Small cannot succeed on her claim that this referral was illegal under the ADA.

### E. Retaliatory Discharge

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by" the ADA. 42 U.S.C. § 12203(a). Where a plaintiff does not present direct evidence of retaliation, a court "analyzes his [or her] claim for ADA retaliation using the McDonnell-Douglas burden-shifting approach." Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014). Under this test, the plaintiff must first establish

a prima facie case of retaliation by "showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." Id. "Protected activity typically refers to action taken to protect or oppose a statutorily prohibited discrimination." Id. (quoting Goonan v. Fed. Reserve Bank of N.Y., 916 F. Supp. 2d 470, 484-85 (S.D.N.Y. 2013)).

Plaintiff claims that Defendant MSCAA retaliated against her "on account of her opposition to the unlawful FFDE and the exercise of her ADA rights during the FFDE." (2d Am. Compl. ¶ 126.) The Court finds, however, that the referral to the FFDE was not unlawful. See supra Part II.D. Thus, Plaintiff did not engage in the statutorily-protected activity of opposing prohibited discrimination; rather, Plaintiff opposed a lawful referral. Accordingly, Plaintiff cannot establish a prima facie case of ADA retaliation on this ground.

Additionally, the ADA does not affirmatively protect an individual's right to record a medical examination. Although an individual may lawfully record his or her own communications pursuant to 18 U.S.C. § 2511(2)(d) and Tenn. Code Ann. § 39-13-601(b)(5), said right is not one "granted or protected by" the ADA. See 42 U.S.C. § 12203(b). Accordingly, Plaintiff cannot

establish a prima facie case of ADA retaliation because the ADA does not cover the activity for which she allegedly suffered retaliation.  See Rorrer, 743 F.3d at 1047.

The evidence presented at trial, nevertheless, demonstrates that MSCAA terminated Plaintiff for a pattern of insubordination, not for opposing the FFDE.  The MSCAA decisionmakers found Plaintiff's insistence on recording the FFDE to be representative of a larger problem with Plaintiff's continued resistance to the FFDE and continued insubordination. Before Plaintiff attempted to record the FFDE, Plaintiff (1) presented a letter to the first psychologist, Edward Wise, that questioned his ethics; (2) refused to sign forms furnished by Wise; (3) was reassigned to a second psychologist, Dr. Alex; (4) was provided Dr. Alex's standard medical consent forms ahead of time, but still asked if she could alter the forms during her June 13, 2012, meeting with Dr. Alex (see Ex. 18); and (5) presented a similar letter to Dr. Alex regarding ethical standards for psychologists (see Ex. 17).  Additionally, after Dr. Alex ended the FFDE session on June 20, 2012, Small never asked MSCAA to reschedule the FFDE or to permit her to record the interview.  Thus, based on Kuhn's correspondence with Sullivan (see Ex. 15) and the information Dr. Alex provided to MSCAA (see Ex. 58), MSCAA understood Small's insistence on recording to be yet another episode of resistance to the FFDE.

In the paramilitary setting of the MSCAA Police Department, this resistance was labeled insubordination and unbecoming conduct and disciplined accordingly.[4]

For these reasons, the Court holds that Plaintiff fails to establish a claim of retaliation under the ADA.

**F.    Defendant Beasley's Qualified Immunity**

The Court finds that Plaintiff has failed to demonstrate that Defendant Beasley violated any of her constitutional rights and, accordingly, concludes that Defendant Beasley is entitled to qualified immunity.

"Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Estate of Carter v. City of Detroit, 408 F.3d 305, 310 (6th Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Sixth Circuit applies a two-step analysis to determine whether a defendant is entitled to qualified immunity: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been

_____

[4] The question before the Court is not whether Small was, in fact, insubordinate in delaying the FFDE until she heard back from Dr. Alex.  The question is whether MSCAA discriminated against Small by referring her to the FFDE or by firing her based on her failure to complete it.  Based on the information available to and considered by the MSCAA decisionmakers, the Court finds that neither the referral to the FFDE nor the termination was unlawful.

violated, and (2) whether that right was clearly established."
Id. at 310-11 (citing Saucier v. Katz, 533 U.S. 194, 201
(2001)). "Courts have discretion to decide the order in which
to engage these two prongs." Tolan v. Cotton, 134 S. Ct. 1861,
1866 (2014) (per curiam).

Considering the evidence presented at trial, Beasley's
actions did not violate a clearly established constitutional
right. The claims against Defendant Beasley are: (1) hostile
work environment, (2) employment discrimination, and (3)
violations of procedural due process.

First, as discussed above, although Small was subject to
hugs by Defendant Beasley, Beasley stopped hugging Small after
she asked him to stop. This conduct does not rise to the
objective level of severe or pervasive harassment. See supra
Part II.A. Accordingly, Beasley's actions did not violate
Small's constitutional rights.

Second, the Court finds that Beasley did not treat Small
differently than similarly situated employees or unilaterally
take any adverse employment action against Small. Neither
Officer Stubbs, Officer Brauer, nor Lt. Williams could be
considered to be similarly situated to Small. See supra Part
II.B.1. Accordingly, Small failed to prove that Beasley treated
her differently than similarly situated employees.
Additionally, Small failed to demonstrate that Beasley

unilaterally took any adverse employment action against her.
The decisions to (1) suspend Small for nine days and refer her
to an FFDE, (2) change Small's leave status from paid to unpaid,
and (3) terminate Small's employment were collaborative
decisions between Beasley, Gread, and Human Resources.  Beasley
was not the sole or final decisionmaker with respect to any of
these actions.  Moreover, as discussed above, none of these
actions violated Small's constitutional rights.

Third, the May 16, 2012, panel decision to sustain the
charges against Small and the resulting decision to suspend
Small and refer her to a FFDE, as well as the June 28, 2012,
panel decision to sustain the charges against Small and the
resulting decision to terminate Small were (1) not
unconstitutional, and (2) not unilateral decisions on the part
of Defendant Beasley.  See supra Part II.C.  Accordingly,
Beasley cannot be considered to have violated a "clearly
established constitutional right" and is therefore entitled to
qualified immunity.

## III. CONCLUSION

For the reasons set forth in this opinion, the Court finds
that (1) Plaintiff failed to prove by a preponderance of the
evidence that she was subject to a hostile work environment
based on sex by MSCAA; (2) Plaintiff failed to prove that she
was the victim of sex discrimination by MSCAA; (3) Plaintiff

failed to prove that MSCAA violated her procedural due process rights; (4) MSCAA has proven that the FFDE referral was job-related and consistent with business necessity; (5) Plaintiff failed to prove that MSCAA unlawfully retaliated against her under the ADA; and (6) Beasley is entitled to qualified immunity as to all of the claims against him.

**IT IS SO ORDERED**, this 2nd day of December, 2015.


/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE